CONE v. POWERS. See Case No. 3,096.

CONE v. WHITING PAPER CO. See Case No. 3,096.

CONESTOGA, The (LYLE v.). See Case No. 8,622.

———

## Case No. 3,097.

### The CONFISCATION CASES.

[1 Woods, 221.][1]

Circuit Court, D. Louisiana. April Term, 1872.[2]

CONFISCATION — RIGHTS OF THE UNITED STATES— ACCRUAL OF RIGHT—PLEADING—PROCEEDINGS— PRACTICE—SALE—REVIEW — AID OF REBELLION —LOAN BY NEUTRAL—LIEN OF TENANT.

1. Although proceedings for confiscation of lands are proceedings at law, and are to be reviewed by writ of error, yet proceedings by way of intervention in the course thereof, setting up a lien on the property, are often in the nature of a bill of equity, and may be reviewed by way of appeal.

2. Letters of credit given to a Confederate agent to enable him to prosecute his mission abroad in aid of the Confederate government are to be considered as given in aid of the rebellion, and void.

3. Loans made by a Frenchman in Paris to a Confederate agent, unless knowingly made for the express purpose of carrying on hostilities against the United States, are to be regarded as made by an innocent neutral, and valid.

4. But such agent could not transfer to such neutral, property within the Union lines, as security for the loan, after it became subject to confiscation, so as to defeat the right of the United States to seize and confiscate the same.

5. Such right of confiscation accrued in this case on the passage of the confiscation act of July 17, 1862 (12 Stat. 590).

6. A covenant by a landlord to pay for improvements erected by a tenant does not constitute a lien upon the premises for the value of the improvements.

7. The proceedings under the fifth, sixth, seventh and eighth sections of the confiscation act of July 17, 1862, are in rem, conforming as near as may be to proceedings in admiralty when the seizure is on water, and to revenue cases when the seizure is made on land.

[See note at end of case.]

8. If a claimant of land or property, seized on land, contests the material facts alleged in the libel of information, the issue is to be tried by a jury.

9. When no answer is filed, judgment by default may be taken, and the court may proceed to ascertain the material facts in the case ex parte and without a jury.

10. If a third person intervenes for the purpose of setting up some charge or lien upon the property and not of resisting the confiscation,

collateral proceedings may be taken suitable to the nature of the case.

11. A belligerent has the right to take such course and impose such conditions with regard to the confiscation of enemies' property, as it sees fit.

12. The rights of a government against its own citizens in rebellion are not less but rather greater than those it may exercise towards a foreign enemy.

13. By the act of July 17, 1862 [12 Stat. 589], congress directed property to be seized and confiscated as enemies' property. A proceeding under this act is not, therefore, a criminal proceeding, and many rules which must be observed in criminal prosecutions have no application.

14. A libel of information filed for the confiscation of property as enemies' property which charges the acts of the owner of the property in the alternative, thus: "did act as an officer of the army or navy of the rebels in arms against the government of the United States, or as a member of congress, or as a cabinet officer of the so-called Confederate States," etc., is bad, for ambiguity and uncertainty, and in fact contains no charge at all, and a decree of confiscation rendered thereon by default will be reversed.

15. The general rule, that a judicial sale under a judgment which the court had jurisdiction to render, will stand, although the judgment itself be reversed for error, applies to sales made by virtue of a decree of confiscation.

16. The constitutional provision which declares that "no attainder of treason shall work corruption of blood or forfeiture, except during the life of the person attainted," does not apply to the confiscation of enemies' property even though those enemies be rebels against the government and, therefore, guilty of treason.

17. But under the confiscation act of July 17, 1862, as explained by the joint resolution of congress of the same date (12 Stat. 627), the forfeiture of real estate confiscated as enemies' property does not extend beyond the natural life of the party whose property is confiscated.

Heard on appeals from and writs of error to the district court for the district of Louisiana.

[Libels of information by the United States to condemn and forfeit certain property of John Slidell and of Charles M. Conrad and of Francis H. Hatch, under the act of congress of July 17, 1862 (12 Stat. 589).

[On the presentation of the libel of information in the Slidell Case, the district court directed a warrant to issue to the marshal, commanding him to seize the property described, and to cite and admonish the owner or owners, and all other persons having or pretending to have any right, title, or interest in or to the same, to show cause, if any, why the property should not be condemned and sold according to the prayer of the libelants. The marshal returned on the 3d of October, 1863, that he had seized the property, posted copies of the libel of information, warrant, and judge's order, and published a monition, as directed by the court; and on the 18th day of April, 1864, after due monition and proclamation, no claim or defense having been interposed, a default was entered, and the information was adjudged and taken pro

[1] [Reported by Hon. William B. Woods, Circuit Judge, and here reprinted by permission.]

[2] [Principal cases reversed in The Confiscation Cases, 20 Wall. (87 U. S.) 92, 22 U. S. (Lawy. Ed.) 326, 328. Cases of the interveners affirmed in Citizens' Bank v. U. S., Id. 327.]

confesso. Depositions were then taken and filed, and on the 18th of March, 1865, after consideration of the law and the evidence, the district court adjudged and decreed a condemnation and forfeiture of the property to the United States. Subsequently, a venditioni exponas was issued, under which portions of the property were sold.

[On the 17th day of March, 1870, the case was removed to this court by writ of error.

[There were likewise appeals by the several interveners, also writs of error by Conrad and Hatch, from the judgment of the district court against them.]

J. R. Beckwith, U. S. Atty., L. M. Day, and R. Waply, for the United States.

T. J. Semmes, Robert Mott, Thos. A. Clark, T. L. Bayne, H. Renshaw, Jr., A. Pitot, C. M. Conrad, C. A. Conrad, E. C. Billings, A. de B. Hughes, G. Breaux, and C. E. Fenner, for various defendants.

BRADLEY, Circuit Justice. Under the act of July 17, 1862 [12 Stat. 589], entitled "An act to suppress insurrection, to punish treason and rebellion, to seize and confiscate the property of rebels, and for other purposes," the marshal of the United States for the district of Louisiana, on the 15th of August, 1863, seized the property in question in this case, as the property of John Slidell; and on the 15th of September, 1863, the district attorney of the United States for the same district filed a libel or information for the confiscation of said property. The libel charges that Slidell, subsequently to the passage of the act, "did act as an officer of the army or navy of the rebels in arms against the government of the United States, or as a member of congress, or as a judge, or as a cabinet officer, or as a foreign minister, or as a commissioner of the so called Confederate States of America; or that, while owning property in a loyal state or territory, etc., he did give aid and comfort to the rebellion." Other charges were made against him of the same general character, and it was claimed, that by reason of the premises, the property described in the libel was forfeited to the United States, and ought to be condemned to their use; and prayed process against the property and the owner thereof, and all persons interested or claiming an interest therein, to warn them to appear and answer the information. Process was accordingly issued and duly published. Several persons appeared and filed petitions of intervention, setting up title to certain portions of the land seized, or liens by way of mortgage or otherwise upon portions thereof. John Arrowsmith claimed title to several squares in New Orleans as having been purchased by him many years before. The Citizens' Bank of Louisiana claimed a mortgage upon a portion of the property to secure a stock note for $4,104, due the first of June, 1863; and also a mortgage on another portion to secure it for

advances upon a letter of credit given to Slidell on the 3d of September, 1861, upon Messrs. F. Ad. Marcuard & Co. of Paris, upon which he had drawn $25,000, prior to the 13th of May, 1862. The latter mortgage was registered May 2, 1862. F. A. Marcuard, a citizen of France, claimed a mortgage lien upon certain portions of the property to secure certain loans of money made by him to Slidell in Paris, namely, 250,000 francs, on the 4th of June, 1862, payable in one·year, which mortgage was received at New Orleans by Eugene Rousseau, agent of Marcuard, July 14, 1862, and recorded on the same day, before the appointment of a register by Gen. Butler; and, afterwards, again recorded on the 29th of July, 1862, by a recorder appointed by him, and deposited with a notary, August 4, 1862; and again recorded, with the act of deposit, on the 9th of August, 1862. On the 11th of August, 1862, Gen. Butler issued an order for the confiscation of Slidell's property, and the rents were afterwards received by the military authorities on the property mortgaged. Nicholson & Co. claimed a lien on certain property for laying the Nicholson pavement. The state of Louisiana claimed a lien for certain taxes due. Mrs. Gaines claimed to be the owner of certain lots specified in her petition. The Merchants' Bank of New Orleans claimed a certain brick building in which their banking business had been carried on, and an equitable interest in the lot on which, etc., by virtue of a certain agreement. Oritz Huppenbauer, a tenant of two lots, claimed to have largely increased their value by making permanent improvements, and desired an equitable allowance therefor.

In the principal cause of confiscation a default was taken on the 18th of April, 1864; and a decree of condemnation rendered on the 18th of March, 1865. Various proceedings were had and considerable evidence was taken upon the several interventions, and decrees were made by the district court in each case favorable or unfavorable to the claims presented. Amongst others, a decree was made July 7, 1865, dismissing the claim of the Citizens' Bank to a mortgage lien for 100,000 francs, or $25,000, advanced upon their letter of credit given to Slidell in September, 1861. Another decree was rendered on the same day dismissing the claim of Marcuard to a mortgage lien for 250,000 francs lent to Slidell in Paris. On the 5th of May, 1866, the court dismissed the claim of the Merchants' Bank of New Orleans. From all these decrees appeals were regularly taken by the interveners; and one of the questions before this court is, whether an appeal lies in such cases. A motion has been made to dismiss the appeals on the ground that the proper remedy for revising the judgment or decree of the district court is a writ of error, and not an appeal.

It has undoubtedly been decided by the

supreme court in the case of Armstrong's Foundry, 6 Wall. [73 U. S.] 766, and other cases, that the proceedings for confiscation are proceedings at common law, and not in admiralty or equity; and, therefore, require a jury for the trial of issues of fact, and a writ of error to revise the judgment. This view is corroborated by the recent cases of Garnett v. U. S. [11 Wall. (78 U. S.) 256]; McVeigh v. U. S. [Id. 259]; and Miller v. U. S. [Id. 268]. But interventions of third parties, made during the course of the proceedings, setting up some claim to, or lien upon the property, are often in the nature of a bill in equity, and require an equitable proceeding to ascertain and establish the rights of the parties. They are especially so when they seek to establish a lien upon the property or any portion thereof, and to subject it or the proceeds of it to the payment of a debt or other claim having priority over the claim of the government, or constituting a legal charge upon the property when the cause of confiscation occurred. I conceive the claims of the interveners in this case, who have appealed as before stated, to be of this kind. Hence, in my judgment, no trial by jury was requisite in reference to those claims; and the decrees rendered in reference thereto are subject to appeal rather than to writ of error. Whether they would come up as outbranches of the record, and be subject to review upon a writ of error brought to the principal judgment in the case, it is, perhaps, unnecessary to decide. I hold, therefore, that the appeals taken in this case by the interveners above named were properly taken and should not be dismissed.

The next question is whether they were well taken. As the district judge has not assigned his reasons for dismissing the claims, I am somewhat at a loss to know the precise grounds on which his decision was founded. In the case of the Citizens' Bank, I presume the ground must have been that the letter of credit was manifestly given to Slidell to enable him to accomplish his mission to France in the service of the Confederate cause. It has been repeatedly decided at the circuit, and, in the cause of Hanauer v. Doane, 12 Wall. [79 U. S.] 342, by the supreme court, that a contract made in furtherance of the rebellion or in aid of the Confederate cause, is void, and cannot receive the aid of the courts. The furnishing of Slidell with a letter of credit when he went to Paris as the emissary of the Confederacy was so manifestly intended to subserve this end that I cannot disturb the decree dismissing the claim.

The case of Marcuard, however, is different from any which has yet been decided. The precedents have all been cases in which the transaction was between citizens of the United States, owing allegiance to the government thereof. But Marcuard was a citizen of France, and the loan made by him

to Slidell was made in Paris. It was a a loan of money made by a neutral on neutral territory, to an enemy, or, at most, to a citizen of the United States engaged in hostile operations against the United States. An innocent loan made to such a person, unless made for the purpose of enabling him to carry on hostilities, is a valid transaction everywhere. And the neutral is not bound to presume that such hostile use is to be made of the money loaned. One witness states that there was a general notoriety that Slidell was purchasing gunboats in Paris for the use of the Confederacy; but there is no direct evidence on the subject; and there is no evidence, except the amount of the loan, that the money was borrowed for other than private purposes. And the amount is hardly sufficient to throw the burden of proof on the lender. It seems to me that the case does not show sufficient evidence of notice to Marcuard, that any unlawful use was to be made of the money loaned by him, to defeat his claim. Supposing the debt to be a valid one, was it a lien or a charge upon the property in question when the cause of confiscation occurred? This cause cannot be said to have occurred before the passage of the act of congress, July 17, 1862; but from that moment it existed, and the general rule is, that a judgment of confiscation relates back to the act which causes it. The question, then, is reduced to this: whether Marcuard's lien on the property in question had become complete on the 17th day of July, 1862? New Orleans was then in the possession of the United States forces. Military rule prevailed. All civil authority emanated from the power, or existed at the sufferance of the United States military authorities from the occupation of the city early in May, 1862. Could Slidell, a declared rebel and enemy, in Paris, during this period, transfer or incumber property located in New Orleans, within the military lines of the United States? If he could do it as to third persons, could he do it as to the United States? Had he been in the Confederacy he could not have done it at all. For in that case, every attempt to deal with property within the Union lines would have been abortive and void. It was forbidden by public proclamation of the president, and by the usages of belligerents. Did his residence in France give any greater validity to his acts as against the government of the United States? In my judgment it did not. And Marcuard, in taking a mortgage from Slidell on property within the Union lines, took the risk of the exercise by the government of the United States of its right as a sovereign power engaged in war, to confiscate the property of its enemies. I am therefore of opinion, that the decree upon the intervention of Marcuard must be affirmed.

The next case is that of the Merchants'

Bank of New Orleans. This company held a lease granted by Slidell in 1850 to John Robb & Co. for ten years, at a certain rent. The lessees covenanted to put up on the lots leased, buildings to cost at least $15,000. At the end of the term, Slidell was to pay them the value of the buildings, at an appraisement. The bank claimed a lien by virtue of this contract, for the value of the buildings. The district court rejected the claim. It is difficult to see on what ground a lien for this sum can be maintained. The matter existed simply in covenant. The lease does not contain a word which looks like the creation or expectation of a lien on the property itself. The bank complains that Fish, the purchaser of the property, was permitted to except to the intervention; whereas, he had no right to appear in the suit at all, because the sale had been suspended, and the marshal had not been ordered to proceed. But it matters not that Fish had no interest. The question is, had the bank any interest? Fish, as amicus curiae, might call the court's attention to the want of interest which the bank had. Unless the bank had a lien, the court cannot reverse the decree. In my judgment the bank had no lien, and therefore the decree is affirmed.

I have not adverted to certain general questions applicable to the entire proceedings for confiscation, because they have been settled by adjudications of the supreme court, made since the argument of these cases. That court has disposed of the constitutionality of the act, the power of congress to pass it, and the character of that part of it under which the proceedings are taken. In the case of Miller v. U. S., 11 Wall. [78 U. S.] 268, it has decided that the act has two distinct parts, each part having a separate object. The first four sections provide for the punishment of treason and rebellion as criminal offenses, and are permanent in their character. The remaining sections provide for the confiscation of the property of certain designated parties as enemies' property, and are temporary in their character, being intended for the purpose of insuring the speedy termination of the rebellion. The proceedings under these sections are proceedings in rem, conforming, as near as practicable, to proceedings in admiralty, in cases of admiralty and maritime jurisdiction; and to revenue cases, where the seizures are made on land. In the latter case after seizure, an information is filed by the law officer of the government, setting forth the facts upon which the confiscation is claimed. Whether the information is called a libel of information, or simply an information, is of no consequence. The same court has cognizance of the case whether it is an admiralty or a different revenue proceeding. The nature of the case determines its character. If a claimant of the property appears and contests the material facts alleged, as, for example, the guilt of the owner, or his owner-

ship of the property, the issue is to be tried by a jury. If no person appears to answer the merits, a judgment is taken by default, and the court proceeds to examine witnesses or other evidence ex parte, by way of inquest, to ascertain the principal facts in the case. This examination does not require the intervention of a jury, being only intended to inform the conscience of the court. If a third person intervenes for the purpose of setting up some charge or lien upon the property, and not of resisting the confiscation, collateral proceedings are had, suitable to the nature of the case, as before stated. See the cases of Garnett v. U. S., McVeigh v. Same, and Miller v. Same [supra], and of Union Ins. Co. v. U. S. [6 Wall. (73 U. S.) 759]; Armstrong's Foundry [supra]; and U. S. v. Hart, 6 Wall. [73 U. S.] 770.

This general view of the nature of the proceedings will serve to answer, at once, many of the objections which were so elaborately argued when these cases were heard. A belligerent has a right to take such course, and impose such conditions, with regard to the confiscation of enemies' property, as it sees fit. The rules which it prescribes are not to be questioned by any code except the law of nations, and its own constitution. The rights of a government against its own citizens in insurrection are not less, but are rather greater than those it may exercise towards a foreign enemy. But in either case, the enemies' property may be confiscated simply as such, if the government so determine. Congress, by the act of July 17, 1862, (12 Stat. 587), directs property to be seized and confiscated as enemies' property; but only the property of certain classes of persons. This discrimination renders necessary, when issue is taken upon the information, an inquiry into the guilt or innocence of the owner; not for the purpose of a criminal conviction and sentence, but for the purpose of determining the status of the property seized. Hence many rules, constitutional and otherwise, which require to be observed in criminal prosecutions, have no application to these proceedings. The case is altogether unlike that of an attainder. There the criminal prosecution and conviction are the principal thing. The attainder, like disqualification to be a witness after conviction of perjury, follows as an incident of the conviction. Here the confiscation is the principal thing; and an inquiry into the acts or conduct of the owner of the property may, or may not, be required by the law. If it is required, it is only as a subsidiary thing, and involves no personal sentence or condemnation. Hence, all those objections which are founded on the necessity of a regular indictment, of the personal presence of the accused, of a trial by jury, etc., are out of place. Where the information is traversed, a trial by jury is necessary, it is true, but for another reason, and not because the proceeding is a

criminal one; for the reason, namely, that the seventh amendment to the constitution requires a trial by jury in all suits at common law where the value in controversy exceeds twenty dollars. These considerations render it unnecessary to examine more in detail the various points that were raised on the argument. Having held the appeals taken by the Citizens' Bank, by Marcuard, and by the Merchants' Bank, to be properly taken, the several writs of error sued out by those parties will be dismissed.

The next case to be considered is the writ of error of John Slidell. The final judgment of condemnation was rendered on the 18th of March, 1865, and the writ of error was sued out on the 17th of March, 1870. It was sued out, therefore, just in time to save the statute of limitations. The supreme court in the case of McVeigh v. U. S., 11 Wall. [78 U. S.] 259, decided that the owner of the property, though a rebel and within the Confederate lines, was entitled to appear and contest the proceedings, or bring a writ of error upon the judgment. The writ, therefore, is regularly brought, and we are obliged to examine the record. Many of the questions raised have been already disposed of, and need not be again adverted to. There is one objection, however, that has given me some trouble, namely, the insufficiency of the information. It is one of the most remarkable specimens of loose pleading and uncertain statement that I remember ever to have seen. After having duly alleged the seizure of the property and fully described it, it states that John Slidell was, at the time of filing the information, and on the 17th of July, 1862, and previously, the owner thereof. Then, having stated the existence of the rebellion, and the passage of the confiscation act, it proceeds to allege: "V. That the said John Slidell subsequently to the said 17th of July, 1862, did act as an officer of the army or navy of the rebels in arms against the government of the United States, or as a member of congress, or as a judge of a court, or as a cabinet officer, or as a foreign minister, or as a commissioner, or as a consul, of the so called Confederate States of America; or, that, while owning property in a loyal state or territory of the United States, or of the District of Columbia, he did give aid and comfort to the rebellion against the United States, and did assist such rebellion." Now, from this allegation, can any mortal man tell what John Slidell did?

The next article is of the same ambiguous and inconsequential nature. The extreme ambiguity of these charges is something more than a matter of form; it amounts to a substantial defect. There is, in truth, no charge at all. There is no charge that Slidell acted as a foreign minister of the Confederacy. The allegation is that he either did that or something else; but we are not informed what. If the defect were one of form, it might be amended; but being substantial,

it seems to me it is fatal. The other articles of the information do not save it. The seventh article alleges that John Slidell, subsequently to the 17th of July, 1862, within a state or territory of the United States, was engaged in armed rebellion against the government, and did not within sixty days after the proclamation of the president, made on the 25th of July, 1862, cease to aid and abet such rebellion, etc. And the eighth article is of similar character to the seventh. Now, not only is the same ambiguity kept up in these articles, as in the previous ones, but they do not set forth any of the offenses which, in the statute, are made the basis or cause of confiscation. They are evidently meant to be assigned under the 6th section of the act. But that section refers to persons who, in any state or territory of the United States, other than those named as aforesaid, were engaged in the rebellion. Now, the states named as aforesaid were the loyal states, which had just been named in the last clause of the 5th section. Therefore the states or territories, other than those, were the disloyal or rebellious states. So that the 6th section of the act only refers to persons who, within any disloyal or rebellious state or territory, were engaged in the rebellion. Yet the seventh article of the information merely alleges that John Slidell, within a state or territory of the United States, was engaged in rebellion. It does not make a charge within the statute. The whole information, therefore, is substantially defective, and the judgment must be reversed. The same defect is fatal to the judgments in the cases of Conrad v. U. S., and in Hatch v. U. S., and the judgments in those cases must also be reversed.

It is, perhaps, not necessary, at this time, to decide what will be the effect of reversing those judgments which have been reversed. But as the subsequent proceedings may depend on a solution of the question, and as the parties in interest will be desirous of knowing the position in which they stand, it is proper that I should give my opinion on the point. It is a general rule that a judicial sale under a judgment which the court had jurisdiction to render will stand, although the judgment itself be subsequently reversed for error. I see no reason why that rule should not apply in these cases. It is true that a judgment of reversal usually contains a direction that the plaintiff in error be restored in all things to that which he hath lost by reason of the erroneous judgment. But the mode of making this restoration, where a sale of property has taken place under the reversed judgment is by awarding to the plaintiff in error the proceeds of the sale. This will be the proper course in these cases.

One question to which considerable attention was given upon the argument was, whether anything more than an estate for the life of the owner was transferred by the

confiscation proceedings. Indeed, it was alleged as a ground of error that all the right, title and estate of the owner was condemned and sold. I do not regard this form of judgment as material; although on looking at the judgments, it will be found that the form of judgment pursued was, "that the said sixteen lots of ground, the property of A. B. be, and the same are hereby condemned as forfeited to the United States," without any definition or limitation of the estate forfeited. I regard the judgments as to be construed by the law which authorizes the confiscation to be made; and am of opinion that the several sales by the marshal had the effect of transferring only such estate as it was lawful to sell. What that estate is, is the question. The joint resolution approved at the same time with the confiscation act provides, that no punishment or proceedings under the act shall be so construed as to work a forfeiture of the real estate of the offender beyond his natural life. It seems to me that this provision extends to the whole act, and to "the proceedings," for confiscation, as well as to the prosecution for the crimes of treason and rebellion. It may be very true, and I am inclined to think it is true, that the constitutional provision, which declares that no attainder of treason shall work corruption of blood, or forfeiture, except during the life of the person attainted, does not apply to the confiscation of enemies' property, even though those enemies be rebels against the government and, therefore, guilty of treason. But whether it applies or not, congress, from respect to the scruples of the president, or for other reasons which seemed to it sufficient, did enact, as it had a right to do, that no proceedings under the confiscation act should be so construed as to work a forfeiture of real estate beyond the natural life of the offender. And I can see no way in which this limitation can be confined to criminal proceedings under the act. It seems to me that by a fair interpretation, it extends to all proceedings by which a forfeiture is effected or adjudged.

NOTE [from original report]. These causes were heard on error by the supreme court of the United States at the October term, 1873. That court reversed the judgment in the Slidell Case, holding that the information was sufficient after default made and final judgment of condemnation, and disposed of the other cases upon that view, affirming some and reversing others. See The Confiscation Cases, 20 Wall. [87 U. S.] 92.

[NOTE. Mr. Justice Strong delivered the controlling opinion, and assigned as the grounds of reversal that, while the information was inartificially drawn, yet, after default and final judgment of condemnation, the judgment should not be disturbed for mere formal and unimportant faults of pleading.
[The court then proceeded to notice other objections urged as error in the action of the district court, and disposed of them by holding that in view of the decision of Miller v. U. S., 11 Wall. (78 U. S.) 268, the default established the truth of all the material averments in the information, and, among others, that

there had been an executive seizure, as required by the confiscation act, before the information was filed; that the averment in the information that the seizure was made by the marshal, under authority of the district attorney in pursuance of instructions issued by the attorney general by virtue of the act, sufficiently showed that it was caused to be made by the president, as he, only, was empowered by the act to cause it, and the direction by the attorney general was to regarded as a direction by the president; that the proceeding, though nominally on the admiralty side of the court, was in fact a common-law proceeding in rem, and, there being no issue of fact to be tried, it was immaterial that no jury trial was had, and consequently the proceeding was within the requirements of the act.
[The court further held that the service by the marshal by posting copies of the information, the warrant, and of the order of the judge, and the publication of the citation, were a sufficient compliance with the order requiring posting or publication; that the information was not defective in failing to aver that the causes of forfeiture were contrary to the form of the statute or statutes of the United States in such case provided, as, the proceeding being a civil one, such an averment was unnecessary; that the signing of the warrant, citations, and monition by the deputy clerk was sufficient, the process being attested by the judge, and sealed with the seal of the court; that in accordance with the decision in Miller v. U. S., supra, it would be presumed in support of the judgment that the court had found on sufficient evidence that the property condemned belonged to a person engaged in the rebellion, or who had given aid or comfort thereto, as well as all other facts necessary to the rendition of the judgment, and that the proclamation of amnesty of 1868 did not have the effect to repeal the confiscation act, as there was no power in the president to repeal an act of congress; and, moreover, the property condemned became vested in the United States in 1865, and the subsequent proclamation could not have the effect to divest the rights thus vested. The Confiscation Cases, 20 Wall. (87 U. S.) 92.
[The cases of Conrad and Hatch, the judgments in which were reversed by the circuit court with that in the Slidell Case, were heard by the supreme court at the same time, and a like judgment of reversal rendered on the same grounds as assigned in the Slidell Case. U. S. v. Six Lots of Ground, 22 U. S. (Lawy. Ed.) 326, and see page 328.
[The Citizens' Bank of Louisiana, the Merchants' Bank of New Orleans, and F. A. Marcuard, interveners, likewise appealed to the supreme court, and the action of the circuit court was affirmed in each of the cases, the court holding that the appellants should not have been allowed to intervene, as their interest, if any, was that of lien holders, and that the decree of condemnation and sale thereunder in no way disturbed their liens, if any they had. Citizens' Bank v. U. S., 22 U. S. (Lawy. Ed.) 327.]